FILED

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

' 2014 NOV 26  P 12: 35

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

NIGHT BIRD SECURITY, LLC.,

    Plaintiff,

    v.

TRIPLE CANOPY, INC.,

    Defendant.

Civil Action No.  1 14CV1610  LO/JFA

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Night Bird Security, LLC ("NBS") by and through its undersigned counsel,

K&L Gates LLP, hereby files this Complaint against Triple Canopy, Inc. ("TCI").

## INTRODUCTION

1.    This is an action for tortious interference with contract, tortious interference with business relations, violation of Virginia's business conspiracy statute, civil conspiracy, aiding and abetting breach of fiduciary duty, and misappropriation of trade secrets arising out of TCI's wrongful actions in inducing NBS's independent contractor to terminate his agreement with NBS and to breach covenants in that agreement before and after termination so that TCI could wrongfully procure a contract with a client of NBS, and with whom NBS had a reasonable expectation of continued business relations based on its pre-existing contract.

2.    Plaintiff has been and continues to be irreparably harmed by Defendant's unlawful and tortious conduct.

## THE PARTIES

3.     Plaintiff NBS is a limited liability company organized under the laws of Florida and having a main office at 4731 Lake Road, Miami, Florida 33137 and a mailing address at PO Box 370908, Miami, FL 33137.  NBS is an international security company providing physical security services to multinational corporations, governments, aid organizations and private individuals.

4.     Upon information and belief, Defendant TCI is a corporation incorporated under the laws of Illinois and having a main office at 12018 Sunrise Valley Drive, Suite 140, Reston, Virginia 20191.  TCI provides mission support and integrated security services to governments, multinational corporations and non-governmental organizations across the globe.

## JURISDICTION AND VENUE

5.     The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy, without interest and costs, exceeds $75,000.

6.     Venue is proper within the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1391 because Defendant TCI resides in this judicial district.

## FACTS

I.     **The Raath Independent Contractor Agreement**

7.     On October 21, 2012, NBS entered into an independent contractor agreement with Johan Raath ("Raath"), which had an effective date of August 12, 2012 (the "Independent Contractor Agreement").

8.     The Independent Contractor Agreement was for a term of one year from the effective date, and could be extended through written amendment or subsequent agreement by both parties.

9.     Per the terms of the agreement, the Contractor could request to terminate the agreement before the end of the term by providing fifteen calendar days notice and providing a written warranty that the Contractor was not submitting the request in contravention of either the Non-Interference and/or Non-Competition terms of the agreement.

10.     The Independent Contractor Agreement contains the following "Fiduciary Responsibility" provision:

> The Parties agree that given the unique nature of the tasks to be performed by Contractor, a special confidence in the nature of the fiduciary duty has been reposed in Contractor who, in equity and good conscience, is bound to act in good faith with due regard to the interests [of] the Company. Contractor is entrusted to act on behalf of Company and, therefore, is under obligation to act solely in good faith in matters related to the interest of Company. This duty includes a duty of loyalty, a duty of high care, and a duty to disclose all important matters or information.

11.     The Independent Contractor Agreement also contains several restrictive covenants, including a non-disclosure agreement, a non-interference agreement, and non-competition agreement.

12.     The non-disclosure agreement states, in part, as follows:

> Contractor agrees that during and after the term of this Agreement Contractor will not disclose to any person, firm, or corporation, nor use for Contractor's personal or corporate benefit, or for the benefit of any third party, any proprietary, confidential, technical, or business information of Company or its clients acquired by Contractor in the course of performance of services hereunder.

13.     The non-interference agreement states, in part, as follows:

3

Contractor agrees that Contractor will not, during the duration of this Agreement, including any extensions hereof, plus a period of one (1) year thereafter, disrupt, damage, impair, or interfere with the business of Company, whether by interfering with or seeking to employ or contract with Company, and/or employees, independent contractors, or clients, disrupting Company's relationship with its clients, or otherwise interfering with the business of the Company in any respect.

14.     The non-competition agreement states, in part, as follows:

Contractor agrees not to undertake any business dealings outside of Company that will compete with Company during the performance of this Agreement or for a period of one (1) year after termination or expiration of this Agreement or any extension hereof.

## II.     The Chinese Petroleum Pipeline Project

15.     On February 1, 2013, NBS entered into a contract with Chinese Petroleum Pipeline ("CPP") to provide security services in connection with a well gathering project in Badra, Iraq (the "CPP Project") for an original term of one year (the "CPP Contract"). The CPP Contact was worth approximately $2 million.

16.     NBS appointed Raath as NBS Security Manager for the CPP Project from its inception. Raath was NBS's sole international Security Manager on the CPP Project and was in charge of all NBS security services.

17.     As the NBS Security Manager, Raath had access to all project documents including pricing documents and NBS's contract with CPP, and was CPP's primary contact on-site for all security issues.

18.     Despite early operational issues that arose during the project due to difficulties with the Iraqi government, CPP indicated that it was pleased with the services of NBS and on April 11, 2013, CPP requested additional services from NBS.

4

III.    **Termination of the Raath Agreement**

19.    On the morning of April 13, 2013, Raath informed NBS that he was offered a position at TCI, one of NBS's competitors in Iraq, and that he wished to terminate his Independent Contractor Agreement with NBS.

20.    Upon information and belief, TCI encouraged and induced Raath to terminate his Independent Contractor Agreement with NBS before the expiration of its term.

21.    Pursuant to the termination terms of the Independent Contractor Agreement, Raath continued to work with NBS under the Independent Contactor Agreement until April 30, 2013.

22.    On April 13, 2013, while still an independent contractor of NBS, Raath contacted CPP directly to communicate that he intended to leave NBS.

23.    Raath informed CPP that he would be entering into an agreement with TCI, a competitor of NBS, and facilitated an introduction between CPP and TCI.

24.    On the same morning that he notified NBS of his intent to terminate the Independent Contractor Agreement, less than an hour later, Raath informed NBS that CPP wished to terminate its contract with NBS.

25.    Immediately following the termination of the Independent Contractor Agreement with NBS, upon information and belief, Raath entered into an independent contractor agreement with TCI.

26.    After Raath's departure, NBS reviewed his computer and discovered security plan documents for the CPP Project with TCI's name on them, which were composed during the time that Raath was still under contract with NBS.

5

27.     Upon information and belief, during and after the time Raath was subject to the Independent Contractor Agreement with NBS, TCI encouraged and induced Raath to utilize his knowledge of the CPP Project, the CPP Contract, and information related to NBS's pricing for the CPP Project in order to assist TCI in submitting a proposal to CPP for security services in or around March or April of 2013.

28.     On April 17, 2013, NBS informed TCI by email of Raath's contractual relationship with NBS and that the terms of the Independent Contractor Agreement included restrictive covenants which prohibited Raath from using information obtained from NBS for TCI's benefit, or from competing with NBS.

29.     NBS also informed Raath that he was in violation of the Independent Contractor Agreement based on his facilitation of an introduction between TCI and NBS's client, CPP, and based on his participation in TCI's proposal to CPP.

30.     CPP subsequently rescinded its request to terminate its contract with NBS and the parties continued to operate under the CPP Contract.

**IV.    Negotiations with CPP for Contract Renewal**

31.     The CPP Contract was originally set to expire on February 5, 2014.

32.     In early 2014, NBS began negotiations with CPP to renew its contract for security services in Badra, Iraq.

33.     During the course of negotiations, NBS received an extension on the original CPP Contract until March 5, 2014.

34.     In a meeting on February 2, 2014, CPP conveyed that it was satisfied with NBS's performance and offered NBS a one year contract extension.

6

35.     NBS responded that it would provide a price quotation for the one year extension to reflect a minor price adjustment due to the need for additional services to support the CPP Project.

36.     During the term of NBS's contract with CPP and while NBS was engaged in ongoing negotiations for a one year contract extension, NBS became aware that Raath made several visits to the CPP site and that he had been in regular contact with CPP since leaving NBS.

37.     Upon information and belief, TCI encouraged and induced Raath to communicate with his contacts at CPP.

38.     Upon information and belief, representatives from TCI met with CPP on February 3, 2014, in order to bid for a contract with CPP for security services for the CPP Project.

39.     Upon information and belief, on February 7, 2014, TCI had another meeting with CPP regarding a potential contract.  Raath was one of two TCI representatives present at this meeting.

40.     On a February 13, 2014 the CPP Project Manager informed NBS that CPP typically followed a formal bid process including price negotiations and discussions with interested companies.

41.     Despite this, NBS was not included in the request for proposals for the contract renewal and was never contacted for contract, service, or pricing negotiations after its initial meeting with CPP on February 2, 2014.

42.     CPP awarded the new contract for security services for the CPP Project in Badra, Iraq to TCI.

## COUNT I - TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS EXPECTANCY WITH RESPECT TO THE INDEPENDENT CONTRACTOR AGREEMENT BETWEEN NBS AND RAATH

43.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

44.     TCI tortiously interfered with the Independent Contractor Agreement between Raath and NBS by inducing Raath to terminate that agreement early and by denying NBS the opportunity to renew the Independent Contractor Agreement.

45.     The Independent Contractor Agreement was a valid contract between NBS and Raath which had a term of one year from August 12, 2012.

46.     TCI knew Raath had an agreement with NBS.

47.     TCI intentionally induced Raath to terminate the Independent Contractor Agreement with NBS in April 2013, before the term expired, and as a result of TCI's intentional interference, NBS was denied the opportunity to renew the Independent Contractor Agreement.

48.     TCI's actions constituting intentional interference include offering Raath an agreement before the term expired, which TCI was aware would result in Raath terminating his existing relationship with NBS.

49.     NBS suffered damages as a result of the termination of Raath's Independent Contractor Agreement including but not limited to legal fees in seeking to enforce the Independent Contractor Agreement, damage to its relationship with its clients for whom Raath was their primary contact at NBS, the eventual loss of the CPP Contract, and the costs of identifying, transporting, and training a replacement for Raath.

8

50.     TCI also tortiously interfered with the Independent Contractor Agreement by inducing Raath to breach his fiduciary duties to NBS and his non-disclosure obligations under that agreement while still employed at NBS.

51.     TCI was aware of the terms of Raath's Independent Contractor Agreement which required him to act in NBS's best interest and prohibited him from disclosing any proprietary, confidential, technical or business information acquired by him during the course of his business relationship with NBS.

52.     TCI persuaded Raath to facilitate an introduction between TCI and CPP while Raath was still employed by NBS and subject to the terms of the Independent Contractor Agreement with NBS.

53.     TCI also directed Raath to participate in the drafting of a bid proposal to CPP, which proposal was drafted in part while Raath was still under contract with NBS.

54.     These actions by TCI intentionally induced Raath to breach the terms of his Independent Contractor Agreement with NBS.

55.     TCI further tortiously interfered with the Independent Contract Agreement by inducing Raath to breach the non-interference, non-disclosure and non-competition clauses of that agreement after Raath terminated his contractual relationship with NBS.

56.     TCI was aware that Raath was subject to restrictive covenants including non-disclosure, non-interference, and non-competition agreements which bound Raath for a year after his Independent Contractor Agreement with NBS terminated.

57.     TCI was aware that Raath terminated his Independent Contractor Agreement with NBS on April 30, 2013, and therefore that the restrictive covenants were in effect until at least the end of April 2014.

58.     From the beginning of Raath's relationship in or around May 2013, TCI used Raath as a primary contact with CPP in violation of the non-interference and non-competition clauses of the Independent Contractor Agreement, thereby intentionally causing a breach of that agreement.

59.     TCI also used Raath's experience and knowledge of CPP and the CPP Project in drafting bid proposals and engaging in negotiations with CPP for the CPP Project in both 2013 and 2014 in knowing and intentional violation of the non-disclosure provisions of the Independent Contractor Agreement, which contained continuing obligations that were binding on Raath after termination of that agreement.

60.     **WHEREFORE,** Plaintiff respectfully requests judgment against TCI for damages, punitive damages, interest, and such other and further relief as may be just and proper.

## COUNT II -TORTIOUS INTERFERENCE WITH CONTRACT/BUSINESS EXPECTANCY/BUSINESS RELATIONS WITH RESPECT TO THE CONTRACT BETWEEN NBS AND CPP

61.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

62.     NBS had an ongoing business relationship and expectancy with its client, CPP. NBS had a reasonable expectation of continued profitability of this ongoing business relationship.

63.     TCI was aware of the ongoing business relationship between NBS and CPP.

64.     Despite TCI's knowledge of the existence of the relationship, TCI intentionally interfered with this relationship by the conduct described herein, including but not limited to: soliciting and hiring CPP's primary contact for security services at NBS (Raath), using Raath as the representative of TCI in the course of submitting a proposal and negotiations to procure a

contract with CPP for the CPP Project in Iraq, and inducing Raath to provide confidential information about NBS and the CPP Project in violation of the Independent Contractor Agreement.

65.     Such interference includes interference by improper means and was both intentional and willful as described herein.

66.     **WHEREFORE,** Plaintiff respectfully request judgment against TCI for damages, punitive damages, interest, and such other and further relief as may be just and proper.

## COUNT III -VIOLATION OF VIRGINIA'S BUSINESS CONSPIRACY STATUTE, VA. CODE § 18.2-500

67.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

68.     Upon information and belief, employees and/or independent contractors of TCI and Raath, an independent contractor of TCI, conspired to deprive NBS of its business relationship with CPP with the intent of causing injury to NBS's business.

69.     This conspiracy began when Raath was subject to the Independent Contractor Agreement with NBS, and continued during the time that Raath was subject to an independent contractor agreement with TCI.

70.     Upon information and belief, employees of TCI and Raath were aware of the restrictive covenants, fiduciary duty, and non-disclosure provisions in the Independent Contractor Agreement and knowingly, willfully, maliciously, and without legal justification conspired to breach the Independent Contractor Agreement in order to gain an unfair advantage in seeking to provide CPP security services for the CPP Project.

71.     Raath and TCI willfully conspired to damage NBS's reputation with CPP and, as a result, within the industry at large.

72.     As a result of the conspiracy between Raath and employees at TCI, NBS suffered the loss of an approximately $2 million contract and additional damages in an amount to be determined at trial.

73.     **WHEREFORE**, Plaintiff respectfully requests judgment against TCI, including an injunction, treble damages pursuant to Va. Code Ann. § 18.2-500, punitive damages, attorneys' fees, interest, and such other and further relief as may be just and proper.

## COUNT IV - CIVIL CONSPIRACY

74.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

75.     Upon information and belief, employees and/or independent contractors of TCI and Raath, an independent contractor of TCI, conspired to deprive NBS of its business relationship with CPP with the intent of causing injury to NBS's business.

76.     This conspiracy began when Raath was subject to the Independent Contractor Agreement with NBS, and continued during the time that Raath was subject to an independent contractor agreement with TCI.

77.     Upon information and belief, employees of TCI and Raath were aware of the restrictive covenants and non-disclosure provisions in the Independent Contractor Agreement and knowingly, willfully, maliciously, and without legal justification conspired to breach the Independent Contractor Agreement in order to gain an unfair advantage in seeking to provide CPP security services for the CPP Project.

12

78.     Raath and TCI willfully conspired to damage NBS's reputation with CPP and, as a result, within the industry at large.

79.     As a result of the conspiracy between Raath and employees at TCI, NBS suffered the loss of an approximately $2 million contract and additional damages in an amount to be determined at trial.

80.     **WHEREFORE**, Plaintiff respectfully requests judgment against TCI for damages, punitive damages, interest, and such other and further relief as may be just and proper.

## COUNT V - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

81.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

82.     TCI aided and abetted Raath in breaching his fiduciary duty, which is set forth in the Independent Contractor Agreement.

83.     TCI knew that Raath owed NBS a fiduciary duty pursuant to the terms of the Independent Contractor Agreement.

84.     TCI knew that Raath breached his fiduciary duty by engaging in conduct which was not in NBS's best interest, which conduct includes but is not limited to the following: facilitating an introduction between CPP (NBS's client) and TCI; providing TCI with confidential or other proprietary information related to the CPP Contract and NBS's business practices; and assisting TCI in procuring a contract with CPP, a client of NBS, with whom Raath had been the primary contact while at NBS.

85.     TCI directed and encouraged Raath to breach his fiduciary duty to NBS. TCI's participation in Raath's breach of fiduciary duty includes but is not limited to the following actions: inducing Raath to terminate his relationship with NBS early, encouraging Raath to

inform CPP that he was terminating his agreement with NBS and entering into a new agreement with TCI, and by using Raath as a contact with CPP and/or providing assurances that Raath would be an integral part of any TCI team that would provide security services for CPP under any potential agreement.

86.     TCI also directed and encouraged Raath to assist in drafting a proposal for a security services contract with CPP while Raath was still employed at NBS.

87.     TCI directly benefited from Raath's breach of fiduciary duty by using the information obtained from Raath to gain an unfair advantage in bidding for a contract with CPP, which contract TCI successfully procured.

88.     TCI also directly benefited from Raath leveraging the relationship he had developed with CPP while at NBS, in breach of his fiduciary duty to NBS, in order to procure a contract for security services between CPP and TCI.

89.     **WHEREFORE,** Plaintiff respectfully requests judgment against TCI for damages, interest, and such other and further relief as may be just and proper.

## COUNT VI - MISAPPROPRIATION OF TRADE SECRETS, VA. CODE § 59.1-336

90.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

91.     Upon information and belief, TCI was selected as the new security provider based on Raath's experience working with CPP and because TCI's bid utilized information obtained from Raath regarding NBS's pricing and prior contract with CPP.

92.     NBS's business practices with respect to security services in Iraq, the particular security plans for the CPP Project, pricing arrangements with CPP, and other technical and

business information with respect to the CPP Project or prior dealings with CPP constitute trade secrets.

93.     NBS attempted to protect this information by including restrictive covenants and the fiduciary duty provision in the Independent Contractor Agreement which prohibited Raath, during and after the term of the agreement, from disclosing any proprietary, confidential, technical or business information acquired by him during the course of his business relationship with NBS.

94.     TCI acquired NBS's trade secrets by inducing Raath to terminate his relationship with NBS, hiring him, and subsequently using his knowledge and experience with CPP that he gained while working with NBS in order to procure a contract for the same project and services.

95.     TCI intended from the beginning and did use Raath as one of its primary contacts between CPP and TCI in negotiating to provide services for the CPP Project.

96.     TCI knew that Raath had formerly worked for NBS on the CPP Project and knew that Raath's Independent Contractor Agreement prohibited him from using or sharing the information and prohibited him from competing against NBS.

97.     **WHEREFORE,** Plaintiff respectfully requests judgment against TCI for damages, interest, and such other and further relief as may be just and proper.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff NBS seeks judgment against Defendant TCI in excess of $75,000 for:

a.  compensatory damages (consisting of general and special damages) in an amount to be proven at trial;

b.  an award of punitive damages;

c.  an award of three-fold damages pursuant to Va. Code § 18.2-500;

d.  injunctive Relief;

e.  reasonable attorneys' fees and costs of suit;

f.  costs incurred herein; and

g.  such other and further relief as justice may require.

### JURY DEMAND

Plaintiff hereby requests a jury trial of its claims against Defendant.

Respectfully submitted,

Andrew N. Cook, Esquire
V.A. Bar I.D. No. 39475
andrew.cook@klgates.com
K&L Gates LLP
1601 K. Street, N.W.
Washington, DC 20006
(202) 778-9106

Michael A. Pavlick, Esquire (*pending pro hac vice admission*)
michael.pavlick@klgates.com
Kaitlin C. Dewberry (*pending pro hac vice admission*)
kate.dewberry@klgates.com
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222-2613
(412) 355-6500

Sermid D. Al-Sarraf, Esq. (*pending pro hac vice admission*)
DSLM Legal Consultancy & Translation Services

16

legal@dslm-law.com
Int'l number - +1-213-384-8500
Fax:  +1-202-380-9434

*Attorneys for Night Bird Security, LLC*

Dated: November **24**, 2014